1
2
3
4
5
6
7
8

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

9   EUGENE A. MAUWEE, SR.,                          )        3:12-cv-00088-LRH-WGC
                                                    )
10                    Plaintiff,                    )        **REPORT AND RECOMMENDATION**
                                                    )        **OF U.S. MAGISTRATE JUDGE**
11           vs.                                    )
                                                    )
12   NEVADA DEPARTMENT                              )
     OF CORRECTIONS, et. al.                        )
13                                                  )
                      Defendants.                   )
14   _____            )

15           This Report and Recommendation is made to the Honorable Larry R. Hicks, United States

16   District Judge. This action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C.

17   § 636(b)(1)(B) and the Local Rules of Practice, LR IB 1-4. Before the court is Defendants' Motion for

18   Summary Judgment. (Doc. # 21.) [1] Plaintiff opposed (Doc. # 23) and Defendants filed a reply (Doc. #

19   24).

20           After a thorough review, the court recommends that Defendants' motion be granted.

21                                          **I. BACKGROUND**

22           At all relevant times, Plaintiff, Eugene A. Mauwee, Sr., was an inmate in the custody of the

23   Nevada Department of Corrections. (Pl.'s Compl. (Doc. # 4) at 1.) This litigation arises from events that

24   took place while Plaintiff was housed at Northern Nevada Correctional Center (NNCC). (*Id.*) Defendants

25   are Nevada Department of Corrections, Greg Cox, E.K. McDaniel, Jack Palmer, Lisa Walsh, and Adam

26   Watson. (*Id.* at 2-3.) Plaintiff, a *pro se* litigant, brings this action pursuant to 42 U.S.C. section 1983 and

27

28           [1] "Doc. # ___" refers to the court's docket number.

1 the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc-1(a).

2       Plaintiff filed a complaint asserting virtually identical claims to this action in 2011.

3 *See Mauwee v. Nevada Department of Corrections*, 3:11-cv-00761-LRH-WGC. Pursuant to stipulation

4 of the parties, the court dismissed that action without prejudice, and Plaintiff subsequently filed the

5 instant action. The court determined that its screening determinations in the previous action would apply

6 to the instant action. (*See* Doc. # 3, referencing the screening order in the previous case, also Doc. # 3

7 in 3:11-cv-00761-LRH-WGC.) Plaintiff's motion for class certification was denied in the previous action

8 as well as in the instant action. (*See* Doc. # 3 in both actions.) Therefore, the court will ignore the

9 references throughout Plaintiff's opposition which refer to a class of similarly situated Native

10 Americans. (*See, e.g.,* Doc. # 23 at 7, 9, 10, 11.)

11       Plaintiff, a Native American, asserts that his rights under the Free Exercise Clause of the First

12 Amendment, the Equal Protection Clause of the Fourteenth Amendment, as well under RLUIPA, have

13 been violated by Defendants in connection with the restriction on access to raw foods, including raw

14 meat, rice, and potatoes, for preparation of a ceremonial meal during the Native American sweat lodge

15 ceremony. (Doc. # 4 at 4.) On screening, the court asserted that Plaintiff could proceed with his religious

16 rights claims as set forth in the screening of his initial action filed in 2011. (Doc. # 3.)[2] Plaintiff alleges

17 that NDOC previously permitted Native American inmates to utilize raw food items in connection with

18 participation in the sweat lodge ceremony, but with the implementation of Administrative Regulation

19 (AR) 810, that policy was terminated. (*Id.* at 4-5.) Plaintiff's equal protection claim is based on the

20 allegation that Jewish inmates continue to receive kosher meals, which he asserts is probably because

21 former NDOC Director Howard Skolnik was Jewish. (*Id.*)

22       Defendants now move for summary judgment. (Doc. # 21.) First, Defendants argue that

23 Plaintiff's First Amendment rights were not violated. (*Id.* at 5-11.) Defendants claim they did not burden

24 Plaintiff's free exercise of religion as he is able to participate in the sweat lodge ceremony and can

25 ───────────────

26    [2]While the screening order in 3:11-cv-00761-LRH-WGC only addresses claims under the First
Amendment and RLUIPA, the court finds Plaintiff has also stated a colorable equal protection claim in
27 the instant action. Since Defendants have addressed the complaint as such, by arguing they are entitled
to summary judgment on the equal protection claim, there is no prejudice in making this determination.

28

1   purchase food items from the prison canteen or bring his sack lunch to the sweat lodge. (*Id.* at 5-6.) In

2   addition, they assert that NDOC's restriction on raw foods is reasonably related to legitimate penological

3   interests including: guarding against food-borne illness associated with raw meat and dairy products;

4   precluding the use of raw grains (including rice) from being fermented and made into alcohol; preventing

5   cooking utensils utilized to prepare the food from being used as weapons; and preventing tampering with

6   food and the appearance of favoritism which may cause altercations among prisoners. (*Id.* at 6-9.)

7   Defendants further argue Plaintiff has alternative means of exercising his religious freedom because he

8   is permitted to participate in various religious ceremonies including the sweat lodge, pipe ceremonies,

9   and smudging, and may possess various religious personal property items. (*Id.* at 9.) They contend that

10  if Plaintiff were provided raw ingredients prison staff would have to be diverted to the Native American

11  grounds to ensure the raw food is handled and utilized properly. (*Id.* at 9-10.) Their final argument with

12  respect to Plaintiff's First Amendment claim is that NDOC has already adopted readily available

13  alternatives to providing inmates with raw foods because inmates can purchase cooked items from the

14  prison canteen or take a sack lunch to the sweat lodge ceremony. (*Id.* at 10.)

15       Second, with respect to Plaintiff's RLUIPA claim, Defendants argue that they have not

16  substantially burdened Plaintiff's ability to exercise his religious beliefs because Plaintiff is permitted

17  to participate in the sweat lodge ceremonies and can bring pre-cooked food purchased from the prison

18  canteen or bring his sack lunch to use as a ceremonial meal to use as an offering and to replenish the

19  body in the same manner as raw food. (*Id.* at 11-12.) Additionally, Defendants contend that the raw food

20  restriction furthers a compelling government interest by the least restrictive means. (*Id.* at 13.)

21  Defendants assert that the compelling government interests include preserving the health and safety of

22  inmates, as described in their argument against Plaintiff's First Amendment claim. (*Id.* at 13-14.) They

23  further state that they have utilized the least restrictive means because in lieu of implementing an

24  outright ban on the ceremonial meal Native American inmates can purchase or bring pre-cooked foods

25  to the sweat lodge ceremony to participate in the ceremonial meal. (*Id.* at 14.)

26       Third, Defendants argue that Plaintiff cannot recover monetary damages under RLUIPA against

27  Defendants in either their individual or official capacities. (*Id.* at 15-16 (acknowledging that the Ninth

28                                              3

1    Circuit has not addressed whether RLUIPA permits damages claims against defendants in their
2    individual capacities but citing authority from the Fourth, Fifth, Seventh and Eleventh Circuits as well
3    as corresponding orders from district courts within the Ninth Circuit, including this district, holding that
4    it does not).)

5        Fourth, Defendants maintain that Plaintiff's equal protection claim fails because he cannot
6    demonstrate that as a Native American he is similarly situated to Jewish inmates receiving Kosher meals,
7    nor can he establish that Defendants intentionally discriminated against him because of his Native
8    American beliefs. (*Id.* at 17-20.)

9        Fifth, Defendants argue that they are entitled to qualified immunity because it was not clearly
10   established that a policy restricting raw food at a religious ceremony violated an inmate's constitutional
11   rights. (*Id.* at 22-23.)

12       Sixth, Defendants assert that Plaintiff cannot maintain his official capacity damages claims
13   against Defendants under 42 U.S.C. § 1983. (*Id.* at 22.)

14       Finally, Defendants claim that NDOC is not a proper defendant because it is not subject to
15   liability under section 1983. (*Id.* at 22-23.)

16       Plaintiff opposes Defendants' motion. (Doc. # 23.) A large portion of Plaintiff's opposition
17   focuses on the fact that Native Americans were previously allowed to utilize raw food to prepare their
18   ceremonial meal during the sweat lodge ceremony. (Doc. # 23 at 2-6.) First, Plaintiff asserts that his First
19   Amendment rights were violated when Defendants denied him the sweat lodge meal. (*Id.* at 7.) Plaintiff
20   cites authority from the Ninth Circuit that prisoners are entitled to a diet consistent with their religious
21   beliefs. (*Id.* at 7-8 (citing *McElyea v. Babbit*, 833 F.2d 136, 198 (9th Cir. 1987) and *Ashelman v.*
22   *Wawrzaszek*, 111 F.3d 674, 677-78 (9th Cir. 1997)). Second, Plaintiff maintains that Defendants violated
23   his rights under RLUIPA by denying raw food commodities to prepare the sweat lodge meal. (Doc. #
24   23 at 8-9.) Third, Plaintiff goes on to argue that the raw food restriction runs afoul of the Equal
25   Protection Clause. Plaintiff also argues that the prison will not provide Native Americans with raw foods
26   for their ceremonial meal, but provides Jewish inmates with kosher meals at a substantial cost to the
27   institution. (*Id.* at 6, 10-11.)

28                                                    4

1    Next, Plaintiff makes reference to an alleged retaliatory transfer from NNCC to Lovelock

2    Correctional Center (LCC) in March 16, 2012 (*id.* at 11), but because Plaintiff's complaint does not

3    include allegations of retaliation related to this transfer, the court's analysis will not evaluate this portion

4    of his argument. Plaintiff may address this issue through the appropriate prison grievance channels, and

5    if he is not satisfied with the results, he can file a new action if he believes his rights have been violated.

6    Finally, Plaintiff contends that during the time Native Americans were permitted access to raw

7    foods there were no health issues, the cooking utensils were not utilized as weapons, and it would not

8    be possible to make alcohol in the time allotted for the sweat lodge ceremony, and nevertheless, Plaintiff

9    would not permit it to occur. (*Id.* at 12-13.) In addition, he claims that if Native Americans were again

10   given access to raw foods they would utilize methods to ensure they were prepared in a sanitary manner.

11   (*Id.* at 13.)

12                                    **II. STANDARD OF REVIEW**

13   "The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to

14   the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th

15   Cir. 1994) (citation omitted). All reasonable inferences are drawn in favor of the non-moving party. *In*

16   *re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255

17   (1986)). Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on

18   file, and any affidavits show that there is no genuine issue as to any material fact and that the movant

19   is entitled to judgment as a matter of law." *Id.* (quoting Fed.R.Civ.P. 56(c)). Where reasonable minds

20   could differ on the material facts at issue, however, summary judgment is not appropriate. *See*

21   *Anderson*, 477 U.S. at 250.

22   The moving party bears the burden of informing the court of the basis for its motion, together

23   with evidence demonstrating the absence of any genuine issue of material fact. *Celotex Corp.  v.*

24   *Catrett*, 477 U.S. 317, 323 (1986). Although the parties may submit evidence in an inadmissible form,

25   only evidence which might be admissible at trial may be considered by a trial court in ruling on a motion

26   for summary judgment. Fed.R.Civ.P. 56(c).

27   In evaluating the appropriateness of summary judgment, three steps are necessary:

28                                              5

1  (1) determining whether a fact is material; (2) determining whether there is a genuine issue for the trier

2  of fact, as determined by the documents submitted to the court; and (3) considering that evidence in light

3  of the appropriate standard of proof. *See Anderson*, 477 U.S. at 248-250. As to materiality, only disputes

4  over facts that might affect the outcome of the suit under the governing law will properly preclude the

5  entry of summary judgment; factual disputes which are irrelevant or unnecessary will not be considered.

6  *Id.* at 248.

7       In determining summary judgment, a court applies a burden shifting analysis. "When the party

8  moving for summary judgment would bear the burden of proof at trial, 'it must come forward with

9  evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'[ ] In

10 such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact

11 on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474,

12 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden

13 of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting

14 evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the

15 nonmoving party failed to make a showing sufficient to establish an element essential to that party's case

16 on which that party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 323-25. If the moving

17 party fails to meet its initial burden, summary judgment must be denied and the court need not consider

18 the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970).

19      If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish

20 that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

21 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not

22 establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute

23 be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W.*

24 *Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)(quotation marks

25 and citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on

26 conclusory allegations that are unsupported by factual data. *Id.* Instead, the opposition must go beyond

27 the assertions and allegations of the pleadings and set forth specific facts by producing competent

28

6

1    evidence that shows a genuine issue for trial. *See* Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324.

2         At summary judgment, a court's function is not to weigh the evidence and determine the truth

3    but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249.   While the

4    evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in its favor,"

5    if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary

6    judgment may be granted. *Id.* at 249-50, 255 (citations omitted).

7

8                                    **III. DISCUSSION**

     **A. NDOC**
9

10        Defendants are correct that NDOC is not a proper party to Plaintiff's claims brought pursuant

11   to 42 U.S.C. §1983, which states, in pertinent part:

12            Every *person* who, under color of any statute, ordinance, regulation, custom, or usage,
              of any State or Territory or the District of Columbia, subjects, or causes to be subjected,
13            any citizen of the United States or other person within the jurisdiction thereof to the
              deprivation of any rights, privileges, or immunities secured by the Constitution and laws,
14            shall be liable to the party injured in an action at law, suit in equity, or other proper
              proceeding for redress...

15   (Emphasis added.) The State of Nevada and any governmental entity that is considered an "arm of the

16   State" for Eleventh Amendment purposes are not "persons" within the meaning of the term. *See*

17   *Arizonans for Official English v. Arizona*, 520 U.S. 43, 69 (1997); *Howlett v. Rose*, 496 U.S. 356, 365

18   (1990); *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70-71 (1989); *Flint v.* Dennison, 488 F.3d

19   816, 824-25 (9th Cir. 2007); *Doe v. Lawrence Livermore Nat'l Laboratory*, 131 F.3d 836 (9th Cir.

20   1997). Section 1983 claims against states, therefore, are legally frivolous. *See Jackson v. Arizona*, 885

21   F.2d 639, 641 (9th Cir. 1989), *superseded by statute on other grounds as stated in Lopez v. Smith*, 203

22   F.3d 1122, 1130 (9th Cir. 2000) (en banc). NDOC is considered an arm of the state; therefore it is not

23   a person for purposes of section 1983, and the claims against NDOC should be dismissed with prejudice.

24   *See Doe*, 131 F.3d at 839; *Hale v. Arizona*, 993 F.2d 1387, 1398-99 (9th Cir. 1993) (en banc) (Arizona

25   Department of Corrections was arm of state and, thus, not a person for purposes of section 1983).

26   Defendants do not contend, however, that NDOC is not a proper party to Plaintiff's RLUIPA claim. As

27   will be set forth below, Plaintiff cannot maintain an action for monetary damages against NDOC because

28                                            7

1   NDOC, as an arm of the State, has not waived its sovereign immunity. *See Sossamon v. Texas*, 131 S.Ct.

2   1651, 1660 (2011) ("States, in accepting federal funding, do not consent to waive their sovereign

3   immunity to private suits for money damages under RLUIPA because no statute expressly and

4   unequivocally includes such a waiver."). Plaintiff can maintain an action against NDOC for injunctive

5   relief.

6   **B. Official Capacity Monetary Damages & Monetary Damages under RLUIPA**

7       **1. Plaintiff cannot recover monetary damages against Defendants sued in their official**

8   **capacities under section 1983**

9       A state official sued in his or her official capacity for *monetary damages* is not  a person subject

10  to suit under § 1983. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). Claims against

11  defendants in their official capacities are actually suits against the entity of which the named defendants

12  are agents. *See Kentucky v. Graham*, 473 U.S. 159 (1985). "As long as the government entity receives

13  notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be

14  treated as a suit against the entity." *Id*. at 166. The real party in interest in such suits is the entity itself,

15  and the entity, not the named defendant, will be liable for any damages. *Id*. Therefore, Plaintiff cannot

16  recover monetary damages against Defendants sued in their official capacities under section 1983.

17      **2. RLUIPA claim**

18          **i. Plaintiff cannot seek monetary damages against a defendant in his/her official**

19  **capacity under RLUIPA**

20      In *Sossamon v. Texas*, 131 S.Ct. 1651 (2010), the Supreme Court held that a plaintiff cannot

21  recover monetary damages under RLUIPA against a state because a state is entitled to sovereign

22  immunity. "For sovereign immunity purposes, we treat [a] suit against state officials in their official

23  capacities as a suit against the state." *Holley v. Cal. Dep't of Corr.*, 599 F.3d 1108, 1111 (9th Cir. 2010).

24          **ii. Individual capacity damages claim**

25      The United States Supreme Court has not addressed whether damages are available against a

26  defendant sued in his or her individual capacity under RLUIPA, and the Ninth Circuit has expressly

27  reserved this issue. *See, e.g., Florer  v. Congregation Pidyon Shevuyim, N.A.*, 639 F.3d 916, 922 n. 3

28                                                      8

1   (9th Cir. 2011) ("Defendants do not challenge, and we do not decide, RLUIPA's application to private

2   actors sued for damages in their individual capacity...The Ninth Circuit has not ruled on this issue in a

3   precedential opinion, and we reserve this question for another day."). Five circuit courts, as well as

4   several district courts in the Ninth Circuit, including this district, have held that RLUIPA does *not*

5   authorize suits for damages against government officials in their individual capacities.

6   *See Rendelman v. Rouse*, 569 F.3d 182, 187-89 (4th Cir. 2009); *Sossamon v. Texas*, 560 F.3d 316, 327-

7   29 (5th Cir. 2009), *cert. granted in part in* 131 S.Ct. 1651 (2011) (affirming decision that states do not

8   waive sovereign immunity under RLUIPA for monetary damages claims); *Nelson v. Miller*, 570 F.3d

9   868, 886-89 (7th Cir. 2009); *Stewart v. Beach*, 701 F.3d 1322, 1334-1335 (10th Cir. 2012); *Smith v.*

10  *Allen*, 502 F.3d 1255, 1271-75 (11th Cir. 2009); *Birdwell v. Cates*, No. CIV. S-10-0719 KJM GGH P,

11  2012 WL 1641964, at *9 (E.D. Cal. May 9, 2012); *Kindred v. Cal. Dep't of Mental Health*, No. 1:08-cv-

12  1321-AWI-GSA-PC, 2011 WL 2709104, at *8-9 (E.D. Cal. July 12, 2011), adopted in 2011 WL

13  4055394 (E.D. Cal. Sept. 12, 2011); *Parks v. Brooks*, No. 3:04-cv-00501-HDM-VPC, 2010 WL

14  5186071, at * 2 (D. Nev. Dec. 15, 2010).

15          These courts generally reason that because RLUIPA was enacted pursuant to Congress's Article

16  I spending power, and individual officials are not the recipients of federal funds, monetary liability

17  cannot be imposed on these defendants in their individual capacities. This court finds no reason to depart

18  from this line of cases, and determines that Plaintiff cannot maintain a claim for damages under RLUIPA

19  against defendants sued in their individual capacities.

20  **C. First Amendment Free Exercise of Religion**

21          **1. Legal Standard**

22          The First Amendment to the United States Constitution provides in pertinent part: " Congress

23  shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]"

24  U.S. Const. amend I. Plaintiff's action implicates the Free Exercise Clause of the First Amendment. (*See*

25  Doc. # 4.) The United States Supreme Court has held that prisoners retain their First Amendment rights,

26  including the right to free exercise of religion. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987)

27  (citations omitted); *accord Hartmann v. Cal. Dep't of Corr.*, 707 F.3d 1114, 1119 (9th Cir. 2013);

28                                                          9

1    *Shakur v. Schriro*, 514 F.3d 878, 883-84 (9th Cir. 2008) (citations omitted); *McElyea v. Babbitt*, 833

2    F.2d 196, 197 (9th Cir. 1987) (per curiam)(citations omitted). "The free exercise right, however, is

3    necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate

4    correctional goals or to maintain prison security." *McElyea*, 833 F.2d at197 (citations omitted); *see also*

5    *Hartmann*, 707 F.3d at 1122 (citations omitted) ("prisoner's right to freely exercise his religion...is

6    limited by institutional objectives and by the loss of freedom concomitant with incarceration"); *Shakur*,

7    514 F.3d at 884 (citations omitted).

8         For the Free Exercise Clause to apply, the inmate must show that his claim involves a sincerely

9    held  religious belief that is consistent with his faith. *See Shakur*, 514 F.3d at 884-85.

10         In analyzing the legitimacy of regulation of an inmate's religious expression, courts are instructed

11   to utilize the factors outlined in *Turner v. Safely. See O'Lone*, 482 U.S. at 394; *Shakur*, 514 F.3d at 884.

12   Under *Turner*,"[w]hen a prison regulation impinges on inmates' constitutional rights, the regulation is

13   valid if it is reasonably related to legitimate penological interests." *Turner v. Safely*, 482 U.S. 78, 89

14   (1987); *see also O'Lone*, 482 U.S. at 349; *Shakur*, 514 F.3d at 884; *Witherow v. Paff*, 52 F.3d 264, 265

15   (9th Cir. 1995); *Freeman v. Arpaio*, 125 F.3d 732, 736 (9th Cir. 1997), *overruled on other grounds in*

16   *Shakur*, 514 F.3d at 884-85. To determine if a prison regulation is reasonably related to a legitimate

17   penological interest, the court considers the following factors set out in *Turner v. Safely*: (1) whether

18   there is a "'valid, rational connection' between the prison regulation and the legitimate governmental

19   interest put forward to justify it"; (2) "whether there are alternative means of exercising the rights that

20   remain open to prison inmates"; (3) what impact the requested accommodation "will have on guards and

21   other inmates, and on the allocation of prison resources generally"; and (4) whether the "absence of

22   ready alternatives is evidence of the reasonableness of a prison regulation" or the existence of obvious

23   alternatives evidences an "exaggerated response." *Turner*, 482 U.S. at 89-90. In evaluating a free

24   exercise claim, courts must give "appropriate deference to prison officials," *O'Lone*, 482 U.S. at 349,

25   because "the judiciary is 'ill-equipped' to deal with the difficult and delicate problems of prison

26   management." *Thornburgh v. Abbot*, 490 U.S. 401, 407-08 (1989) (citation omitted).

27   ///

28                                            10

1    **2. Analysis**

2            **i. Sincerely held religious belief**

3            Defendants do not dispute that Plaintiff's claim involves a sincerely held religious belief

4    consistent with his faith, but instead dispute that Defendants burdened the ability to practice his religion.

5    Therefore, the court will move on to an analysis of whether the restriction on raw food is reasonably

6    related to a legitimate penological interest.

7            **ii. The *Turner* Factors**

8                    **a. Is there a valid, rational connection between the raw food restriction and**

9    **the proffered government interests put forward to justify the restriction?**

10           Legitimate penological interests include "the preservation of internal order and discipline, the

11   maintenance of institutional security against escape or unauthorized entry, and the rehabilitation of

12   prisoners." *Procunier v. Martinez*, 416 U.S. 396, 412 (1974) (footnote omitted), limited by *Thornburgh*

13   *v. Abbott*, 490 U.S. 401 (1989). Where a plaintiff presents evidence of a lack of a rational relationship

14   between legitimate penological interest and a prison regulation, then "[p]rison authorities cannot rely

15   on general or conclusory assertions to support their policies. Rather, they must first identify the specific

16   penological interests involved and then demonstrate both that those specific interests are the actual bases

17   for their policies and that the policies are reasonably related to the furtherance of the identified interests.

18   An evidentiary showing is required as to each point." *Walker v. Sumner*, 917 F.2d 382, 396 (9th Cir.

19   1990); *see also Ashker v. Cal. Dep't of Corr.*, 350 F.3d 917, 922  (9th Cir. 2003) (citations omitted);

20   *Prison Legal News v. Cook*, 238 F.3d 1145, 1150 (9th Cir. 2001). When a plaintiff has not presented

21   evidence, but only alleges, that there is a lack of a rational relationship between a legitimate penological

22   interest and a prison regulation, then it is enough that a reasonable prison official would think that the

23   policy would serve a legitimate penological  interest even if there is no evidence of problems in the past

24   or a likelihood of problems in the future. *See Ashker*, 350 F.3d at 922-23. Thus, with respect to the

25   connection between the regulation of religious exercise and the legitimate penological interest, evidence

26   concerning anticipated problems, even though no actual problems have arisen from the prisoner's

27   conduct, is sufficient to meet this standard. *Friedman v. Arizona*, 912 F.2d 328, 332-33 (9th Cir. 1990);

28                                                  11

1    *Standing Deer v. Carlson*, 831 F.2d 1525, 1528 (9th Cir. 1987).

2        Defendants assert that the restriction against raw food is reasonably related to the legitimate

3    government interests of maintaining the safety and security of the institution. (Doc. # 21 at 6-9.) First,

4    Defendants claim that providing inmates with access to raw food, including uncooked meats, exposes

5    inmates to potential illness caused by undercooking of meat or cross-contamination of other foods. (*Id.*

6    at 7.) Next, Defendants contend that this would expose inmates to a risk of food-borne illnesses because

7    of improper storage of food because the Native American grounds provide no method of refrigeration

8    and there is no way for participants to wash their hands or any utensils or cookware. (*Id.*) Additionally,

9    NDOC would not be able to ensure that once the food was in the hands of the Native Americans that it

10   would be cooked properly and in a sanitary manner. (*Id.* at 7-8.)

11       In addition to the concerns about food-borne illness, Defendants argue that providing inmates

12   with raw fruits and vegetables, including rice, is a security concern because the grain could be fermented

13   and turned into prison-made alcohol. (*Id.* at 8.)

14       Defendants then assert that the Native Americans would need access to cooking utensils to turn

15   the raw ingredients into a meal, and these utensils, including pots and pans could be transformed into

16   weapons, posing a security risk to the institution. (*Id.*)

17       Finally, Defendants assert that providing inmates with access to raw food could lead to tampering

18   with food designated for a particular inmate or the unfair distribution of food among inmates which may

19   lead to an altercation. (*Id.*) In particular, Defendants assert that the culinary utilizes a "blind services"

20   method for providing food to inmates where food servers are separated from inmates by a wall with a

21   small slot which prevents service staff from trying to harm a specific inmate because they cannot see

22   who is receiving the food. (*Id.*) Additionally, providing some inmates with raw food could lead to

23   accusations of favoritism or unfair portioning. (*Id.*)

24       While Plaintiff states in his opposition that no one has gotten sick when raw foods were provided

25   to Native Americans in the past, that food would be handled properly, that alcohol could not be made

26   in the time period afforded for the sweat lodge ceremony, and that cooking utensils would not be used

27   as weapons, he produces no evidence to support these bare assertions Thus, he has not sufficiently

28                                              12

1   dispelled Defendants' proper correctional interests so as to create a genuine issue of material fact as to

2   whether Defendants' restriction on access to raw foods is reasonably related to the proffered correctional

3   goals. Defendants, on the other hand, have adequately described potential safety and security concerns

4   attendant to allowing access to raw foods, including meat and grains. Accordingly, the first *Turner* factor

5   weighs in Defendants' favor.

6                    **b. Do alternative means of exercising the rights remain open to Plaintiff?**

7          Under this factor, "[t]he relevant inquiry...is not whether the inmate has an alternative means of

8   engaging in the particular religious practice that he or she claims is being affected; rather, [the court

9   must] determine whether the inmates have been denied all means of religious expression." *Ward v.*

10  *Walsh*, 1 F.3d 873, 877 (9th Cir. 1993) (citing *O'Lone*, 482 U.S. at 351-52); *see also Mayweathers v.*

11  *Newland*, 258 F.3d 930, 938 (9th Cir. 2001). "Also relevant to the evaluation of the second factor is a

12  distinction *O'Lone* had no occasion to make: the distinction between a religious practice which is a

13  positive expression of belief and a religious commandment which the believer may not violate at peril

14  of his [or her] soul." *Ward*, 1 F.3d at 878-880 (depriving Orthodox Jewish inmate of kosher diet, a rabbi

15  and religious services, the second factor weighed in inmate's favor, but an inmate's request not to be

16  transported on Sabbath was not reasonable under second factor because he had many opportunities to

17  observe the Sabbath)); *see also Henderson v. Terhune*, 379 F.3d 709, 714 (9th Cir. 2004) (where

18  prisoner, by cutting his hair, would be considered "defiled" and "therefore unworthy or unable to

19  participate in the other major practices of his religion," he was "denied all means of religious

20  expression").

21         Plaintiff does not allege that he cannot participate in the sweat lodge ceremony, or even that he

22  cannot participate in the ceremonial sweat lodge meal. Instead, he alleges that his First Amendment right

23  to the free exercise of religion has been violated because Defendants have not provided him with raw

24  food to use in preparing the ceremonial meal. He asserts in his complaint that the Native American

25  sweat lodge ceremony is instrumental to the practice of his Native American faith, and the "ceremonial

26  sweat lodge meal is not only to give offering but to replenish the body." (Doc. # 4 at 14.) Plaintiff has

27  not alleged, let alone provided evidence, that raw food is essential to participation in the sweat lodge

28                                                    13

1    ceremonial meal, or that by using something other than raw food, his religious beliefs are violated.

2    Defendants, on the other hand, have proffered evidence that Native Americans are permitted to purchase

3    food items from the canteen that they can utilize at the sweat lodge ceremony, and may also take the sack

4    lunch they are served by NDOC to the sweat lodge ceremony. Thus, while Plaintiff may not make his

5    own ceremonial meal from raw food items, he can bring food items that he has purchased from the

6    prison canteen, or the sack lunch he is served by NDOC to the sweat lodge ceremony for use as a

7    ceremonial meal to "give offering" and "replenish the body." In addition, Defendants provide evidence

8    that Native Americans at NNCC are allowed to participate in pipe ceremonies and smudging in addition

9    to sweat lodge ceremonies. (Doc. # 21 at 9; Ex. E.) Native Americans are also allowed to possess various

10   personal religious property items. (*Id.*)  In the face of this evidence, the court cannot conclude that

11   Plaintiff "has been denied all means of religious expression." *Ward*, 1 F.3d at 877. Therefore, the court

12   finds that the second *Turner* factor weighs in favor of Defendants.

13                    **c. What impact would providing raw food have on guards and other inmates,**

14   **and on the allocation of prison resources?**

15           Defendants have provided evidence that providing raw food would divert kitchen staff to the

16   Native American grounds to ensure that raw food is handled in a safe and sanitary manner. (Doc. # 21

17   at 9-10; Ex. B.) Currently, Native American grounds are supervised by armed officers assigned to gun

18   posts, but if they were allowed access to raw foods, this would require NDOC employee(s) to provide

19   on-the-ground supervision to ensure meat products are properly handled and cooked in a sanitary and

20   safe manner. (*Id.* at 10.) In addition, personnel would need to make sure the food is not tampered with,

21   is fairly served, that cooking utensils did not become weapons, and that certain foods are not misused

22   to make prison-alcohol. (*Id.* at 10; Ex. A, Ex. B.)

23           Plaintiff does not address this factor directly, but instead includes the bare assertion that the raw

24   foods would be handled properly. He has not provided evidence to refute Defendants contentions so as

25   to create a genuine issue of material fact. Therefore, the court finds that the third *Turner* factor favors

26   Defendants.

27   ///

28                                                    14

1    **d. Is the absence of ready alternatives evidence of the reasonableness of the**

2    **raw food regulation or are their obvious alternatives that evidence an exaggerated response?**

3          With respect to the fourth factor, prison officials do not bear the burden of disproving the

4    availability of alternatives. *See O'Lone*, 482 U.S. at 350.

5          Defendants assert that the policy they have adopted is a readily available alternative of allowing

6    prisoners to purchase food items from the prison canteen or to take their sack lunch to the seat lodge

7    ceremony when compared to a complete ban on participation in the sweat lodge ceremony. (Doc. # 21

8    at 10.)

9          Plaintiff references a check out system to provide food and utensils to Native American inmates

10   and asserts that once the items were returned they could be cleaned and sanitized. (Doc. # 23 at 5.) This

11   suggestion does not address, however, how prison officials would assure that once the Native Americans

12   received the food items, they were prepared in a safe and sanitary manner. Nor does this alternative

13   address the safety concern posed regarding the potential use of cooking utensils as weapons, or

14   utilization of raw fruits and vegetables for making prison-made alcohol. Therefore, the court cannot

15   conclude that this is an "obvious" or "ready" alternative that shows an exaggerated response. The court

16   agrees that Defendants considered and implemented the "ready" alternatives of allowing Native

17   American inmates to purchase food items from the prison canteen for use in the ceremonial meal and

18   also permit Native American inmates to take their prison-provided sack lunch to the ceremony.

19   Therefore, the court finds that the fourth *Turner* factor weighs in Defendants' favor.

20         In sum, the court finds that the balance of the *Turner* factors weigh in favor of Defendants and

21   in favor of a finding that the restriction on raw meat is reasonably related to legitimate safety and

22   security interests. Therefore, the court recommends that summary judgment be granted in Defendants'

23   favor on Plaintiff's First Amendment claim.

24   **D. RLUIPA**

25       **1. Legal Standard**

26       RLUIPA provides in relevant part:

27       No government shall impose a substantial burden on the religious exercise of a person

28   15

1    residing in or confined to an institution...even if the burden results from a rule of general
2    applicability, unless the government demonstrates that imposition of the burden on that
     person

3    (1) is in furtherance of a compelling governmental interest; and
     (2) is the least restrictive means of furthering that compelling governmental interest.
4    42 U.S.C. § 2000cc-1(a). "Religious exercise" is defined as "any exercise of religion, whether or not

5    compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000c-5(7)(A); *Hartmann*, 707

6    F.3d at 1124. To establish a RLUIPA violation, Plaintiff bears the initial burden to prove that

7    Defendants' conduct places a "substantial burden" on his "religious exercise." *Warsoldier v. Woodford*,

8    418 F.3d 989, 994 (9th Cir. 2005); *accord Hartmann*, 707 F.3d at 1124 (citing 42 U.S.C. § 2000cc-

9    2(b)). Once Plaintiff establishes a substantial burden, Defendants must prove that the burden both

10   furthers a compelling governmental interest and is the least restrictive means of achieving that interest.

11   *Id.* at 995. RLUIPA is to be construed broadly in favor of the inmate. *See* 42 U.S.C. § 2000cc-3(g).

12   Although RLUIPA does not define "substantial burden," the Ninth Circuit has stated that a

13   substantial burden is one that is "'oppressive' to a 'significantly great' extent. That is, a 'substantial

14   burden,' on 'religious exercise' must impose a significantly great restriction or onus upon such exercise."

15   *Warsoldier*, 418 F.3d at 995 (quoting *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024,

16   1034 (9th Cir. 2004)); *accord Hartmann*, 707 F.3d at 1124-25. "In the context of a prisoner's

17   constitutional challenge to institutional policies, [the Ninth Circuit] has held a substantial burden occurs

18   'where the state...denies [an important benefit] because of conduct mandated by religious belief, thereby

19   putting substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Hartmann*,

20   707 F.3d at 1125 (quoting *Warsoldier*, 418 F.3d at 995) (alteration in original). The burden need not

21   concern a religious practice that is compelled by, or central to, a system of religious belief, *see* 42 U.S.C.

22   § 2000-5(7)(A); however, the burden must be more than an inconvenience. *Navajo Nation v. U.S.*

23   *Forest Service*, 479 F.3d 1024, 1033 (9th Cir. 2007), *aff'd en banc*, 535 F.3d 1058, 1068 (9th Cir. 2008)

24   (internal quotations and citations omitted). In fact, RLUIPA "bars inquiry into whether a particular belief

25   or practice is 'central' to a prisoner's religion." *Cutter v. Wilkinson*, 544 U.S. 706, 725 n. 13 (2005).

26   The burden must prevent the plaintiff "from engaging in [religious] conduct or having a religious

27   experience." *Navajo Nation*, 479 F.3d at 1033 (internal citations omitted).

28

16

1    In evaluating whether the burden on religious exercise furthers a compelling government interest

2    by the least restrictive means, courts should still give deference to the decisions of prison officials. *See*

3    *Cutter*, 544 U.S. at 722 (citation omitted) ("While [RLUIPA] adopts a 'compelling governmental

4    interest' standard, '[c]ontext matters' in the application of that standard" ); *see also* 146 Cong. Rec. S.

5    7774, S 7775 (Statement of Senator Hatch); *Hartmann*, 707 F.3d at 1124 (quoting *Cutter*, 544 U.S. at

6    723) ("Courts are expected to apply RLUIPA's standard with 'due deference to the experience and

7    expertise of prison and jail administrators in establishing necessary regulations and procedures to

8    maintain good order, security and discipline, consistent with consideration of costs and limited

9    resources.'").

10    Prison officials cannot justify a restriction on religion simply citing the need to maintain order

11    and security. *Alvarez v. Hill*, 518 F.3d 1152, 1156 (9th Cir. 2008). Instead, prison officials must

12    demonstrate that they "actually considered and rejected the efficacy of less restrictive measures before

13    adopting the challenged practice." *Id.* at 1156-57.

14    **2. Analysis**

Assuming that participation in the ceremonial meal constitutes a "religious exercise," the court

15    finds that Defendants have sufficiently established that Plaintiff cannot demonstrate that the restriction

16    on raw food substantially burdened the exercise of his religion.

17    As indicated above, Plaintiff alleges in his verified complaint that the sweat lodge ceremony is

18    instrumental to the practice of his Native American faith "because it purifies the participant" and "the

19    preparation of the religious ceremonial sweat lodge meal is not only to give offering, but to replenish

20    the body." (Doc. # 4 at 14.)

21    While Plaintiff asserts that the sweat lodge ceremony and the ceremonial meal are integral to his

22    Native American beliefs, Plaintiff does *not* allege, let alone provide evidence (in the form of a

23    declaration or otherwise), that the provision of *raw food* is essential to participation in the ceremonial

24    sweat lodge meal or sweat lodge ceremony in general or that participation in the ceremonial meal

25    without utilizing raw food violates his beliefs. Defendants, on the other hand, provide evidence that the

26    Native Americans are permitted to purchase food items from the canteen that they can take to the sweat

27

28                                                      17

lodge ceremony, and may also take the sack lunch they are served by NDOC with them to the sweat lodge ceremony. (Doc. # 21-1 at 2 ¶ 5.) Both of these alternatives to the provision of raw food appear to provide Plaintiff with the opportunity to participate in the sweat lodge ceremony, including having a ceremonial meal so that he may "give offering" and "replenish [his] body." Moreover, Plaintiff does not argue that the prison canteen does not offer items sufficient to meet the needs of conducting the ceremonial meal. In *Greene v. Solano County Jail*, 513 F.3d 982, 988 (9th Cir. 2008), the Ninth Circuit said that it "ha[d] little difficult in concluding that an outright ban on a particular religious exercise is a substantial burden on that religious exercise." *Id.* (citations omitted). Here, in contrast, there is not an outright ban on participation in the sweat lodge ceremony or the ceremonial meal. Instead, the prison has placed a restriction on the use of raw food during the ceremony.

In the absence of evidence that Plaintiff's participation in the sweat lodge ceremony and ceremonial meal without raw food places "substantial pressure on [Plaintiff] to modify his behavior and to violate his beliefs" Plaintiff cannot be allowed to proceed with this claim. *See Hartmann*, 707 F.3d at 1125 (quoting *Warsoldier*, 418 F.3d at 995). As a result of this finding, the court need not determine whether the raw food restriction furthers a compelling interest by the least restrictive means. Accordingly, the court recommends that summary judgment be granted in Defendants' favor on Plaintiff's RLUIPA claim.

**E. Fourteenth Amendment Equal Protection**

"The Equal Protection Clause requires the State to treat all similarly situated people equally." *Hartmann*, 707 F.3d at 1123 (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985)).

Prisoners are protected by the Equal Protection Clause from intentional discrimination on the basis of their religion. *See Freeman v. Arpaio*, 125 F.3d 732, 737 (9th Cir. 1997) (citing *Cruz v. Beto*, 405 U.S. 319, 321-22 (1968)), *abrogated on other grounds by Shakur*, 514 F.3d at 884-85. "This does not mean...that all prisoners must receive identical treatment and resources." *Hartmann*, 707 F.3d at 1123 (citations omitted).

To establish an equal protection violation, the prisoner must present evidence of discriminatory intent. *See Washington v. Davis*, 426 U.S. 229, 239-40 (1976); *Freeman*, 125 F.3d at 737; *see also*

18

*Hartmann*, 707 F.3d at 1123 (citations omitted) ("[t]o prevail on an Equal Protection claim brought under § 1983, Plaintiffs must allege facts plausibly showing that 'the defendants acted with an intent or purpose to discriminate...based upon membership in a protected class.'").

The court agrees with Defendants that Plaintiff has not provided any evidence of an intent or purpose to discriminate against Plaintiff based on his membership in a protected class.

Plaintiff alleges that his equal protection rights were violated because Jewish inmates were provided Kosher meals, and alleges that this may have been because the former NDOC director was Jewish. Beyond the mere allegation that the former director was Jewish, Plaintiff provides no actual evidence to support his theory. In addition, Plaintiff provides no evidence that he and Jewish inmates receiving a Kosher diet are similarly situated. While he states in his opposition that Jewish inmates receive raw foods as part of their diet, he provides no evidence, in the form of a declaration or otherwise, to support this statement. Defendants provide evidence that inmates who eat a Kosher diet are served ready-to-eat packaged meals, prepared by the prison culinary, or served pre-packaged meals that require, at most, to be reheated. (Doc. # 21-1 at 10 ¶ 13.) With no evidence of intent to discriminate against Plaintiff because of his Native American beliefs, summary judgment should be granted in Defendants' favor on Plaintiff's equal protection claim.

**F. Qualified Immunity**

Because the court has recommended that summary judgment be granted in favor of Defendants with respect to each of Plaintiff's claims, the court need not reach Defendants' qualified immunity argument.

## IV. RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the District Judge enter an Order **GRANTING** Defendants' motion for summary judgment (Doc. # 21).

///
///
///

19

1       The parties should be aware of the following:

2       1.     They may file, pursuant to 28 U.S.C. section 636(b)(1)(c) and Rule IB 3-2 of the Local

3 Rules of Practice, specific written objections to this Report and Recommendation within fourteen (14)

4 days of receipt. These objections should be titled "Objections to Magistrate Judge's Report and

5 Recommendation" and should be accompanied by points and authorities for consideration by the District

6 Court.

7       2.     This Report and Recommendation is not an appealable order and that any notice of appeal

8 pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of

9 the District Court's judgment.

10       DATED: June 26, 2013.

11 

12                       WILLIAM G. COBB
                             UNITED STATES MAGISTRATE JUDGE